**LINK: 139**

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| INTAMIN, LTD, | ) | **Case No. CV 04-0511 GAF (JWJx)** |
| | ) | |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM AND ORDER** |
| | ) | **REGARDING DEFENDANTS' MOTION** |
| v. | ) | **FOR SUMMARY JUDGMENT** |
| | ) | |
| | ) | |
| MAGNETAR TECHNOLOGIES CORP et | ) | |
| al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I. INTRODUCTION

In 2004, Plaintiff Intamin, Ltd. filed this lawsuit alleging a braking system

manufactured by Defendant Magnetar Technologies Corp. infringes Intamin's U.S. Patent

Number 6,062,350 ("the '350 patent"), titled "Braking System for an Amusement Device,"

which describes a magnetic braking system used on amusement park rides.  Magnetar moved

for summary judgment of non-infringement; Judge Taylor, then assigned to the case, granted

the motion and entered judgment for Magnetar.  Magnetar appealed to the Federal Circuit,

which vacated a portion of the claim construction which it deemed to be inadequate and

incomplete.  Intamin, Ltd. v. Magnetar Technologies, Corp., 483 F.3d 1328 (Fed. Cir. 2007).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The matter was remanded to this Court which, after a thorough review of the decision and several status conferences with counsel, set a schedule for briefing and hearing on the validity of dependent claim 10, which is the only claim that Magnetar's system might infringe.  The Court has now conducted the hearing, has read and considered the briefs, and concludes that summary judgment should be entered in favor of Magnetar.

The '350 patent describes a braking system, designed principally for use in a "drop tower" type ride, in which pairs of magnets of alternating polarities are attached to the passenger car and straddle a conducting rail that extends the length of the ride.  The movement of the conducting rail through a magnetic field developed by the magnets creates an "eddy current" that brakes the fall of the car.  Magnetar's braking system, used principally in roller coasters, works in reverse.  It utilizes a conducting fin attached to the moving car and pairs of magnets attached to the track at various points along the ride through which the conducting fin passes.  The resulting "eddy current" acts as a braking force on the moving roller coaster car.

Magnetar's braking system is described by dependent claim 10 in the '350 patent, but that claim is invalid because it omits an essential element of the independent claim on which it is based – a conducting rail configured for attachment to the tower (the fixed device part) and "adapted to extend the length of the fixed device part."  As to the independent claim, the Magnetar device does not infringe it literally because it does not include a conducting rail adapted to extend the length of the ride. Likewise, it does not infringe under the doctrine of equivalents because the patent prosecution history reveals that a broadly worded patent that would have encompassed the Magnetar configuration was re-written to narrow the claim to systems utilizing a conducting rail that extends the length of the ride.  In addition, the '350 patent's specification contains a description of a braking system like that used by Magnetar but does not validly claim that system. For these reasons, which are discussed in greater detail below, Magnetar's motion for summary judgment is **GRANTED.**

//

//

1   //
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.  PROCEDURAL HISTORY

### A. THE COMPLAINT

Intamin, as assignee, allegedly owns the rights to the '350 patent, which discloses a magnetic braking system used in an amusement park ride that includes a fixed framework "preferably designed as dropping framework."  (Jankowski Decl., Ex. 1, Abstract.)  Intamin brought this suit against Magnetar, which manufactures and markets a competing magnetic braking system sold under various names including "Soft Stop Magnetic Brakes" and "Soft Stop Magnetic Braking Systems," and are used primarily in roller coaster rides.  Intamin contends Magnetar has directly infringed, contributorily infringed, and induced infringement of the patent through the sale of its system to amusement park owners and operators.  Suit was filed on April 30, 2004.

In response, Magnetar denied liability for infringement, and asserted various affirmative defenses including invalidity due to obviousness, lack of novelty, Intamin's failure to comply with the requirements of 35 U.S.C. § 112, and Intamin's engaging in bad faith conduct in its dealings with the United States Patent & Trademark Office ("PTO").  Magnetar also asserted counterclaims against Intamin seeking declaratory relief of non-infringement, invalidity, and unenforceability due to inequitable conduct.  On the latter point, Magnetar based its defense on a 1992 article published by named inventor Peter Rosner that allegedly describes the braking system disclosed in the '350 patent.  Since the article was written more than one year prior to the filing of the patent application, Magnetar alleges that it constituted "prior art" that should have been, but was not, included in the applicant's prior art submissions.  Because this prior art allegedly bears on the patentability of Intamin's magnetic braking system, Magnetar claimed that Intamin perpetrated a fraud on the patent office.  The answer and counterclaim was filed on June 15, 2004.  (Docket No. 7.)

### B. THE SUMMARY JUDGMENT MOTION

After a relatively brief period of discovery, Magnetar in December 2004 filed a motion for summary judgment of non-infringement of Claim 1 of the '350 patent.  The motion, which

incorporated arguments pertaining to claim construction of three terms within the patent, asserted that three elements of the single independent claim in the patent are not present in the allegedly infringing device: (1) an "intermediary" between adjacent magnet elements; (2) a metal fin or similar conducting element configured for "attachment to the fixed part" of the ride; and (3) a conducting element that "extends the length" of the fixed part of the ride. Because, according to Magnetar, none of its braking system include these elements, they do not infringe the patent.  Magnetar presented evidence that its system placed the conducting fin, which did not extend the length of the fixed part, on the moving portion of the ride (e.g., a roller coaster car) and installed the magnets to the fixed portion of the ride at locations where braking was required.  Magnetar also demonstrated that it did not employ a non-magnetic intermediary between its magnets, but rather placed the magnets directly in contact with each other in a Halbach array.  Through these arguments, Magnetar sought to demonstrate the absence of essential limitations in its systems, either literally or through the doctrine of equivalents.  Moreover, since all of the remaining claims were dependent on Claim 1, Magnetar contended that it could not have infringed on any of the dependent claims.  See Wahpeton Canvas Co. v. Frontier, Inc., 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989).  Magnetar also sought Rule 11 sanctions because it contended that the lawsuit was brought for an improper purpose – to punish Magnetar because Edward Pribonic, who later became Magnetar's president, testified against Intamin in a personal injury case.  In that lawsuit, brought by a plaintiff who was injured when he was ejected from an amusement park ride, Pribonic opined that the plaintiff's injuries resulted from defects in the Intamin design that would allow a passenger to be ejected from the ride.

        Intamin opposed the motion for summary judgment on multiple grounds.  With respect to the "intermediary" element, Intamin argued that an adhesive or a magnet, both used by Magnetar, could constitute an "intermediary" within the meaning of Claim 1 of the '350 patent.  Indeed, with respect to the use of a magnet, Intamin noted that dependent Claim 2 reads, "the braking device of claim 1 wherein said intermediary is non-magnetic."  (Jankowski

1  Decl., Ex. 1 ['350 patent col. 8 ll. 66-67] at 13.)  Intamin argued that Magnetar's proposed

2  construction would nullify the language of Claim 2.  Moreover, Intamin argued that the

3  intermediary could be a magnet because they do not provide the "main braking force."

4      Regarding the attachment of the conducting device to the "fixed part," Intamin argued

5  that that embodiment of its invention was claimed in dependent Claim 10, which expressly

6  disclosed the device in Claim 1 but "wherein said energizing portion is configured for

7  attachment to said fixed device part, and said conductive portion is configured for attachment

8  to said movable device part."  (Jankowski Decl., Ex. 1 ['350 patent col. 9 ll. 22-25] at 14.)

9  Finally, Intamin asserted that the "extend the length" argument fails because, under standard

10 rules of claim construction, the omission of words like "entire" or "whole" before the word

11 length (e.g., extend the whole/entire length of the fixed device part) eliminates the contention

12 that "extend the length" meant the entire length of the fixed device part.

**C. THE SUMMARY JUDGMENT ORDER**

14     In late January 2005, Judge Taylor issued an order granting Magnetar's motion for

15 summary judgment and its Rule 11 motion for sanctions.  (01/24/05 Order (Docket No. 60).)

16     Judge Taylor concluded that Magnetar was entitled to summary judgment because

17 elements of Claim 1 of the '350 patent were missing from the allegedly infringing system.  A

18 summary of his conclusions is set forth in the table below.  In short, he concluded that the

19 "intermediary" could not be magnetic and had to be something other than air or adhesive,

20 noting that to conclude otherwise would render the language meaningless, and further noting

21 that the specification seemed to expressly contemplate a non-magnetic material between

22 adjacent pairs of magnets.  He concluded that the claim contemplated that the conducting

23 element would be physically "attached" to the stationary portion of the ride, and that "extend

24 the length" meant the length of the ride, from beginning to end.  With respect to the latter two

25 terms, he rejected the contention that dependent Claim 10 could be infringed without an

26 infringement of the independent claim and noted that it was inconsistent with and directly

27 contrary to what was claimed.  He rejected Magnetar's prosecution history estoppel argument

28

because Magnetar failed to present any evidence that would permit an inference of a "clear and unmistakable surrender" of these elements of the claim.  Since the absence of any claimed element from the alleged infringing device precluded a finding of infringement, Judge Taylor entered summary judgment for Magnetar.

**Judge Taylor's Conclusions**

| Term | Construction | Literal Infringement | Doctrine of Equivalents |
|------|-------------|---------------------|------------------------|
| "intermediary disposed" | The intermediary cannot be magnetic (see col. 4 ll. 16-18) and must be more than air or adhesive. | No infringement; the adjacent magnet elements are in direct contact<br><br>SJ for Defendant | No prosecution history estoppel because no clear and unmistakable intent to surrender . . .  But . . .<br><br>SJ for Defendant because failed to claim system with magnets in direct contact even though disclosed in spec |
| "attachment to the fixed device part" | Configured so that it could be and was in fact attached to the non-moving portion of the ride. | No infringement; defendant's design attached the conducting element to the moving part<br><br>SJ for Defendant | P concedes, but says it infringes dependent claim 10, which reverses the structure.   REJECTED.  It would result in infringement of dependent claim w/o infringing indep claim.<br><br>SJ for Defendant |
| "extend the length" | The conducting part extends the entire length of the fixed device part. | The conducting part on D's system never extends beyond a car, so no literal infringement.<br><br>SJ for Defendant | P again relies on Claim 10, which Judge Taylor rejected.<br><br>P also argues that it indicates direction and not distance, which Judge Taylor also rejected. |

"P" refers to Plaintiff Intamin.  "D" refers to Defendant Magnetar.

**D.  THE MOTION FOR RECONSIDERATION AND THE REVISED SUMMARY JUDGMENT ORDER**

Intamin sought reconsideration of the Court's order granting summary judgment.  With respect to the "intermediary" limitation, Judge Taylor denied reconsideration because the only new argument, based on "claim differentiation" could have been, but was not, raised earlier.

(03/15/05 Order Re Motion for Reconsideration (Docket No. 88).)  Regarding the issues pertaining to the "conducting part having at least one conductive rail configured for attachment to the fixed device part," Judge Taylor rejected most of the arguments, which were based on misinterpretations of the Court's order.  He concluded, however, based on testimony from Edward Pribonic, that an issue of fact existed regarding whether or not Magnetar's systems used a conducting fin attached to a ride's track (e.g., the "fixed device part."), though he did not specify whether this was an issue with respect to literal or equivalent infringement.

After issuing this order, Judge Taylor declined to enter summary judgment of non-infringement with respect to the "configured for attachment" language, and also declined to enter judgment with respect to "extend the length" because of genuine issues concerning equivalent infringement.   However, since the intermediary was neither literally nor equivalently part of Magnetar's system, according to Judge Taylor, Magnetar was still entitled to judgment.  Thus, with respect to infringement, the only real issue in the Federal Circuit (from Intamin's perspective) was whether Judge Taylor properly construed the "intermediary" language.

With respect to the sanctions order, the Court reiterated its conclusion that the suit was brought for an improper purpose even though it was not frivolous, and therefore granted sanctions.  Later the Court, based on the Ninth Circuit's decision in <u>Zaldivar v. City of Los Angeles</u>, 780 F.2d 823, 832 (9th Cir. 1986), held a non-frivolous complaint cannot be deemed brought for an improper purpose, and vacated the sanctions.  (04/25/05 Order (Docket No. 109).)

**E.  THE FEDERAL CIRCUIT DECISION**

Intamin appealed the grant of summary judgment; Magnetar appealed the order vacating the imposition of sanctions.

**1.  ADJACENT MAGNETS OF ALTERNATING POLARITY**

The Federal Circuit concluded that the trial judge erred in construing "intermediary" as simply "a member between others."  <u>Intamin Ltd. v. Magnetar Techs., Corp.</u>, 483 F.3d 1328,

1334-35 (Fed. Cir. 2007).  The court first noted that the relevant claim limitation language in its entirety reads:

> a plurality of magnet elements mounted on each of said carrying rails with alternating polarities, said plurality of magnets being further arranged such that the poles of magnet elements mounted on one carrying rail have opposite polarities from the poles of magnetic elements mounted on a corresponding carrying rails of said at least one pair of carrying rails; and
>
> an intermediary disposed between adjacent pairs of said plurality of magnet elements

Id. at 1332.  The court noted that the claim contemplates at least one pair of "adjacent" magnets of "alternating polarities" on each of the "carrying rails," and that the polarity of that magnet be opposite to the polarity of the magnet on the opposite side of the "interferric gap." The district court did not consider whether the adjacent magnets of alternating polarity were required to be of opposite polarity; Intamin argued that alternating polarity meant opposite polarity, while Magnetar argued that the magnets need not be of opposite polarity.  Under Magnetar's construction, a magnet rotated at 90 degrees between two magnets of opposite polarity would not be an intermediary.  Because of the importance of this issue, and because the district court did not address the polarities of the adjacent magnets (which the parties agreed was essential), the court concluded that the construction required further development. Id. at 1335.

The circuit acknowledged that, if the limitation "alternate polarities" means "opposite polarities," then, and only then, can a magnet be an intermediary.  Id.  Why?  Because adjacent pairs of magnets of opposite polarity would need some separation.  Id. at 1334.  The court also indicated that "arguably" none of Magnetar's magnets are used as spacing and support elements because all are necessary to create the one-sided flux of a Halbach array.  Id. n.1. The court ultimately concluded, focusing heavily on "claim differentiation" and the language of dependent claim 2 (allowing that the intermediary could be non-magnetic), that "intermediary" can embrace magnetic substances so long as the additional requirement of "alternating polarities" allows for it.  Id. at 1335.

The remand directs the Court to determine whether "adjacent magnets of alternating polarity" refers to magnets of opposite polarity.  Id.

### 2. EXTEND THE LENGTH

The circuit also considered the meaning of the term "length" as a reference to the claim limitation of a "conductive rail being adapted to extend the length of the fixed device part." Id. at 1335-37.  The district court construed the term "length" to have the ordinary meaning of "extend from end to end - distinguished from width" and found the plain meaning of the phrase encompassed the full and entire length of the fixed device part.  The circuit explained, "the 'fixed device part' refers to the framework of the amusement device, i.e., the track for the roller coaster or tower drop.  The 'conductive rail' refers to a metal rail, part of which will have a conductive coating."  Id. at 1336.  The circuit analyzed the context of the term "length" and affirmed the district court's conclusion that in the context of the claim, the conductive rail must be adapted to extend the entire length of the fixed device part.  Id.

### 3. DEPENDENT CLAIM 10

The Federal Circuit opinion is particularly noteworthy for its discussion of Intamin's challenge to the Federal Circuit's affirmance of Judge Taylor's construction of the "extend the length" element of the '350 patent.  First, the circuit noted that Intamin contested the interpretation because it would preclude the claim from reading on the roller coaster embodiment described in the specification.  483 F.3d, at 1336.  The circuit agreed that "the claim may well not cover this embodiment," but that not all embodiments need be covered by a patent's claims.  Id., at 1337, citing Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1326 (Fed. Cir. 2001).  Furthermore, Intamin argued against this claim interpretation because it would render dependent Claim 10 invalid.  483 F.3d, at 1337.  In response, the circuit noted that dependent Claim 10 "erases entirely a limitation of the fixed device part and is thus an improper dependent claim," and concluded that "[b]ecause claim 1 requires the conductive portion to reach the length of the fixed device part and claim 10 places the conductive portion on the passenger car, claim 10 is an improper dependent claim."  Id. at

1337.  Given this construction of the conducting rail being adapted to extend the length of the fixed device part, the circuit instructed the Court to determine on remand whether Magnetar's brakes infringe the '350 patent, either literally or under the doctrine of equivalents.  Id. at 1337.

Because Claim 1 does not read on Magnetar's device, and Claim 10, which does, is invalid, Intamin's infringement claims fail.  The Court discusses its reasoning in detail in the following sections.

### F. THIS COURT'S FEBRUARY 4, 2009 ORDER

After the Federal Circuit's remand, this Court issued an Order Re: Schedule and Further Proceedings on February 4, 2009.  (Docket No. 131.)  The Court's Order permitted Magnetar to move for summary judgment on two issues before proceeding with further litigation.  The issues were: (1) whether dependent Claim 10 is invalid as an improper dependent claim, and (2) whether Intamin is barred from bringing this infringement suit by the doctrine of unclean hands.  The Court commented,

> it is difficult for this Court to see how dependent claim 10 has any viability since it lacks an essential element of the sole independent claim in this case – a conducting rail affixed to the stationary portion of the ride and extending from the beginning of the ride to the end.  Moreover, since potentially invalid dependent claim 10 describes an arrangement like that incorporated in Magnetar's system, Intamin's case would seem to rise or fall on the validity of that claim.

(Id. at 1-2.)  The Court also acknowledged that if Magnetar could prove that Intamin engaged in improper conduct in its dealings with the patent office, such a resolution "could also circumvent the need for further litigation and promote judicial economy."  (Id. at 2.)

The Court's Order made clear that the Court accepts Judge Taylor's construction of the limitation "conductive rail being adapted to ***extend the length*** of the fixed device part" as meaning the conductive rail extended the entire length of the stationary portion of the amusement park ride, as affirmed by the Federal Circuit.  (Id. at 3) (emphasis in 02/04/09 Order); Intamin v. Magnetar, 483 F.3d 1328, 1336 (Fed. Cir. 2007).  The Court also accepts Judge Taylor's construction of "a conducting part having at least one conducting rail

*configured for attachment* to the fixed device part" to mean the conducting rail was configured for attachment to the stationary portion of the ride, such as a track on a roller coaster.  (02/04/09 Order (Docket No. 131) at 3.) (emphasis in 02/04/09 Order).

Following the Court's advice, Magnetar filed the instant motion for summary judgment on the grounds that (1) Claim 10 is invalid, and (2) Intamin has unclean hands.  Magnetar further moved for summary judgment on the ground that, given the invalidity of Claim 10, Magnetar has not infringed the '350 patent because the only independent claim includes an element – a conducting rail that extends the length of the fixed device part of the ride – that is not found in Magnetar's braking system.  Magnetar's arguments are persuasive.  For the reasons outlined in greater detail below, the motion is **GRANTED**.

### III.  DISCUSSION

#### A. THE SUMMARY JUDGMENT STANDARD

The grant of summary judgment under Federal Rule of Civil Procedure 56 is as appropriate in a patent case as in any other case.  <u>Barmag Barmer Maschinenfabrik AG v. Murata Machinery Ltd.</u>, 731 F.2d 831, 835 (Fed. Cir. 1984).  Summary judgment is appropriate where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrell</u>, 477 U.S. 317, 322 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-50 (1986).  The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  <u>Anderson</u>, 477 U.S. at 256.  After the moving party makes a showing of no genuine issue of material fact, the nonmoving party has the burden of coming forward with evidence of specific facts showing a genuine issue of material fact.  <u>Celotex</u>, 477 U.S. at 325.

When making a determination as to whether there is a genuine issue of material fact, the court, "may not simply accept a party's statement that a fact is challenged."  <u>Barmag</u>, 731 F.2d at 835-36.  Enough evidence must favor the non-moving party's case such that a reasonable jury could return a verdict in its favor.  Evidence that is merely colorable or not significantly probative will not avoid summary judgment.  <u>Anderson</u>, 447 U.S. at 249-50.

Further, "[m]ere denials or conclusory statements are insufficient." Barmag, 731 F.2d at 836. The party with the burden of proof on an issue must provide evidence sufficient, if unopposed, to prevail as a matter of law. Saab Cars USA, Inc. v. United States, 434 F.3d 1359, 1369 (Fed. Cir. 2006).

Here, Intamin bears the burden of proving infringement, while Magnetar bears the burden of proving invalidity and unclean hands. See, e.g., Techn. Licensing Corp. v. Videotek, Inc., 545 F.3d 1316, 1327 (Fed. Cir. 2008); In re Omeprazole Patent Litig., 483 F.3d 1364, 1374-76 (Fed. Cir. 2007).

## B. CLAIM 10 IS AND INVALID DEPENDENT CLAIM.

A patent's "claims" define the invention. The claims are the numbered paragraphs "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. Patent claims come in two general forms: independent claims and dependent claims. Id. Independent claims contain all the claim limitations in the individual claim and, as the name implies, independently stand on their own with respect to the identification of the claim limitations. Id. Conversely, dependent claims incorporate by reference all the claim limitations of a referenced claim, and include additional claim limitations uniquely set forth in the particular dependent claim. Id. See, e.g., Robotic Vision Sys., Inc. v. View Eng'g, Inc., 189 F.3d 1370, 1376 (Fed. Cir. 1999).

The '350 patent discloses two configurations for its magnetic braking system. In the first and primary configuration, the magnets are attached to the moving portion of the ride, i.e., the passenger car, and the conducting rail is attached to fixed portion of the ride, i.e., the track. The patent reveals that this configuration is especially favorable for drop tower amusement park rides. (Jankowski Decl., Ex. 1 ['350 patent col. 2, ll. 23-26] at 10.) This drop tower embodiment is depicted in each of the eleven figures of the patent, where the conducting rail is attached to the fixed portion of the ride, the tower. (Id., Ex. 1 ['350 patent col. 3, ll. 41-44] at 11.) The specification expressly notes that the relationship of magnets and conducting rail can

be reversed (e.g., id., Ex. 1, col. 3, ll.25-20 & ll.45-49), but that configuration is not claimed in independent Claim 1.

Claim 1 embodies the first configuration and, as already discussed, requires that the conducting rail extend the entire length of the tower.  Specifically, Claim 1 recites:

> 1. A braking device for use with an amusement apparatus having a fixed device part . . . and a movable device part . . . , the braking device comprising: . . .
>> (a) a conducting part having at least one conductive rail configured for attachment to the fixed device part, said at least
>> one conductive rail being adapted to extend the length of the fixed device part;
>> (b) an energizing portion . . . ;
>> (c) at least one pair of carrying rails . . . ;
>> (d) a plurality of magnet elements . . . and an intermediary . . . ;
>> (e) wherein . . . movement of the movable device part, relative to the fixed device part, induces eddy currents that create a magnetic brake force . . . .

(Id., Ex. 1 ['350 patent col. 8, ll. 29-65] at 13.)

In the other configuration, embodied by Claim 10, the positions are reversed, which eliminates the element of a conducting rail attached to or extending the length of the fixed device part.  In such a configuration, the magnets are attached to the fixed portion of the ride, which on an amusement park ride like a roller coaster would be the track; the conducting rail is attached to the moving portion of the ride, which would be the passenger car.  This reverse implementation, with the conducting rail attached to the moving car, is not shown in the patent figures, but it is explained as "recommended, for example, [for] a roller coaster[.]"  (Id., Ex. 1 ['350 patent col. 3, ll. 45-49] at 11.)

As noted by the Federal Circuit, Claim 10 is not a proper dependent claim because it eliminates the conducting rail configured for attachment to the fixed device part and adapted to extend the length of the ride, which is an essential element of the sole independent claim in this patent, Claim 1.  Claim 10 depends from Claim 1 and should not only incorporate all of the limitations of Claim 1, but also add more specificity to those limitations.  See 35 U.S.C. § 112 ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.");  e.g., Hutchins v. Zoll Med. Corp., 492 F.3d 1377,

1382 (Fed. Cir. 2007). Instead, Claim 10 eliminates limitations found in Claim 1, which renders Claim 10 invalid. See Pfizer, Inc. v. Ranbaxy Labs. Ltd., 457 F.3d 1284, 1291 (Fed. Cir. 2006) (finding a dependent claim is invalid when it omits an element from the claim upon which it depends).

Intamin cannot refute this reasoning. Intamin focuses on Claim 1's "conducting rail configured for attachment" limitation and argues Claim 10 does not erase this limitation of Claim 1 because the braking system is configured for attachment both to the fixed and the movable device parts. But the patent itself describes the ***conducting rail*** as configured for attachment to the fixed device part, not to the moving portion, and adapted to extend the length of the ride.[1] Thus, the fact that the braking system involves elements attached to both the fixed and moving parts is immaterial – for purposes of determining whether the patent reads on the allegedly infringing device the Court must assess how and where the conducting rail is attached. Moreover, Intamin's argument ignores the Federal Circuit's discussion of the "adapted to extend the length of the fixed device part" described above. That discussion plainly establishes that, under the independent Claim 1, the conducting rail cannot be a fin attached to the moving portion of the ride. As discussed, Claim 10 necessarily erases the "extend the length" limitation in order to be feasible. The patent itself makes clear that the use of a magnetic braking system in a roller coaster configuration would require a design change that reverses the location of the conducting and magnetic elements. (See Jankowski Decl., Ex. 1 ['350 patent col. 3. ll. 25-28] at 14.)

For these reasons, the Court concludes that the only claim that reads on Magnetar's device, and therefore the only claim that it could have infringed – dependent Claim 10 – is invalid and cannot be a basis for a patent infringement claim. The remaining question is whether Magnetar has infringed independent Claim 1 and whether that is an issue that can be

---

[1]The circuit even noted that the problem with Claim 10 was not simply that the conducting rail extended the full length of the ride but that it was attached to and extended some length of the fixed device part. By placing the conducting rail on the moving portion of the ride, Dependent Claim 10 eliminated an essential element of the sole independent claim. See 483 F.3d, at 1337.

resolved at this stage of the proceedings.  As discussed below, the Court concludes that Magnetar's braking system cannot infringe Claim 1 because Magnetar's braking device does not include an essential element of that Claim – a conducting element configured for attachment to the fixed device part and adapted to extend the length of the fixed device part of the ride, and therefore cannot literally infringe on any of the remaining claims because they all depend on Claim 1.   Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1328 n.5 (Fed. Cir. 2008) ("A conclusion of noninfringement as to the independent claims requires a conclusion of noninfringement as to the dependent claims."); Wahpeton Canvas Co. v. Frontier, Inc., 870 F.2d 1546, 1553 (Fed. Cir. 1989) ("It is axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed."). The Court further concludes, for reasons discussed below, that Magnetar has not infringed under the doctrine of equivalents.

The Court therefore turns to a discussion of the alleged infringement of Claim 1.

**C. NON-INFRINGEMENT**

Magnetar moves for summary judgment of non-infringement because, on the undisputed facts, its braking system does not contain either of two limitations: "extend the length of the fixed device part" and "configured for attachment to the fixed device part." Intamin opposes on the basis that Judge Taylor has already denied summary judgment on these questions, finding genuine issues of material fact exist as to whether Magnetar's braking system possesses, literally or under the doctrine of equivalents, these limitations.

**1. LAW OF THE CASE**

Intamin contends Judge Taylor's findings are the "law of the case" and cannot be disturbed because Magnetar did not appeal them to the Federal Circuit.  The law of the case doctrine provides that once a court decides upon a rule of law, that decision is usually binding at subsequent stages of the same case.  Arizona v. California, 460 U.S. 605, 618 (1983). However, "[t]he doctrine of the law of the case is applicable only to final judgments.  The district court has the inherent power to reconsider and modify an interlocutory order any time

prior to the entry of judgment." Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co., 48 F.3d 1066, 1070 (8th Cir. 1995). The doctrine of the law of the case does not apply to Judge Taylor's conclusion that genuine issues of material fact exist, because such a finding does not constitute a final judgment; the court has not yet ruled on the merits of the claim. See Locricchio v. Legal Servs. Corp., 833 F.2d 1352, 1358-59 (9th Cir. 1987); Senza-Gel Corp. v. Seiffhart, 803 F.2d 661, 669 (Fed. Cir. 1986) ("A denial of summary judgment is not only not a "final judgment," and not appealable, it is not a judgment at all. It is quite simply and solely a determination that one or more issues require a trial."). Thus, Magnetar could not appeal Judge Taylor's conclusion that he would not grant summary judgment on the "extend the length" and "configured for attachment" limitations because that conclusion did not comprise a final judgment; for the same reason, the Federal Circuit could not address Judge Taylor's findings. With a more complete record in front of it, and with the benefit of the Federal Circuit's review, the Court now arrives at a different conclusion than Judge Taylor did several years ago.

### 1. Literal Infringement: The Length and Location of the Conducting Rail

With respect to the "conducting rail configured for attachment to the fixed device part," Intamin insists that Magnetar's braking system literally infringes this limitation because Magnetar's brakes are configured in such a way that the conducting rail could be attached to the track and the brakes could be attached to the movable device part. (See Ward Decl., Ex. 3 [Pribonic Depo.] at 66-68.) Such an argument states the obvious but does not answer the question. Whether the conducting rail moves through a stationary magnetic field, or whether the magnetic field is created on a moving object which then moves in a way that a fixed conducting rail passes through the magnetic field, an eddy current is created. But Claim 1 of the patent in issue claims a specific configuration – one in which the conducting rail is stationary, is affixed to the non-moving portion of an amusement park ride, and extends the length of the fixed device portion of the ride. Magnetar's roller coaster braking systems do not

read on the claim precisely because the conducting rail is present in the system as a fin on a moving car that moves through magnetic fields created as various locations along the roller coaster track (the fixed device part).  Thus, the fact that Magnetar **could** manufacture a system that infringes on such a device does not mean that its roller coaster braking systems in fact infringe – they do not.

Intamin places great weight on the testimony of Edward Pribonic, who testified that he once bid on a project to provide the braking system for a drop-tower ride in Asia, where it would have been necessary to attach the conducting rail to the track.  (Id. at 68.)  Intamin also offers an email from Magnetar to a potential customer explaining that Magnetar could assemble its magnetic brakes in one of two ways, with the magnets attached to the fixed part or attached to the moving device part, depending on the needs of the project.  (See Ward Decl., Ex. 4.)  Intamin contends this evidence creates a genuine issue as to whether Magnetar literally infringed the patent.  The Court disagrees.

Years after Judge Taylor's opinion, further discovery has not revealed that Magnetar did anything but discuss the possibility that its braking system could be built in reverse. Nothing has been disclosed indicating that Magnetar ever actually created, sold, or offered to sell brakes that were configured in such a way that the conducting rail was attached to the track and the magnetic brakes were attached to the car.  Magnetar offers a 2009 declaration of Pribonic, where he declares the following, under penalty of perjury:

> "None of Magnetar's systems include a conducting fin configured for attachment to the fixed portion of the ride."  (Pribonic Decl. ¶ 6.)

> "Magnetar has never made, used, sold, or offered for sale a brake system in which the conducting rail is configured for attachment to the fixed device, which is the expected configuration for a drop-tower application.  Nor has Magnetar ever designed a brake system in which the conducting rail is configured for attachment to the fixed device."  (Id. ¶ 9.)

> "Magnetar has never entered into a contract to design, make, or supply magnetic brakes for use on a drop tower."  (Id. ¶ 14.)

The Court must decide whether the evidence Intamin offers, namely the email and Pribonic's 2005 deposition statements, are sufficient to create a genuine issue of material fact for trial. The Court concludes they are not; there is no genuine issue as to whether Magnetar ever configured its brakes such that the conducting rail was attached to the fixed device part. Although it is less clear whether Magnetar ever *offered* to sell such a configuration of brakes, but even the testimony indicating the possibility that Magnetar once bid on a drop tower project does not prove infringement. A bid is not an offer to sell unless it meets the classic contract law requirements. See Rotec Indus. Inc. v. Mitsubishi Corp., 215 F.3d 1246, 1254-55 (Fed. Cir. 2000). Because Intamin has presented no direct evidence of a valid offer to sell, including necessary terms, Magnetar is entitled to summary judgment on the claim of literal infringement.

### 2. THE DOCTRINE OF EQUIVALENTS

#### a. The Legal Standard

Intamin argues that Magnetar has infringed Claim 1 under the doctrine of equivalents because, while Magnetar's braking system does not literally contain a conducting rail that extends the length of the fixed device part, its conducting rail attached to the moving car is equivalent. "Under the doctrine of equivalents, an accused device 'that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is "equivalence" between the elements of the accused product or process and the claimed elements of the patented invention.'" Kahn v. Gen. Motors Corp., 135 F.3d 1472, 1478 (Fed. Cir. 1998) (quoting Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 21 (1997)). To be equivalent, the limitation must perform substantially the same overall work to achieve substantially the same overall result by substantially the same means. Johnston v. IVAC Corp., 885 F.2d 1574, 1581 (Fed. Cir. 1989).

The Supreme Court, while refusing to eliminate the doctrine of equivalents, has recognized that the doctrine "when applied broadly, conflicts with the definitional and public-notice functions of the statutory claiming requirement." Warner-Jenkinson, 520 U.S., at 29.

1    To avoid that consequence, the Supreme Court requires that the doctrine of equivalents be

2    applied to individual elements of the claim, not to the invention as a whole, and that "even as

3    to an individual element, [the doctrine] is not allowed such broad play as to effectively

4    eliminate that element in its entirety."  Id.

5

6         With the Supreme Court's admonition in mind, the Court turns to the language of

7    Claim 1, which unmistakably claims a braking system in which the conducting rail is attached

8    to the fixed device part and extends the length of the ride.  This is a system that has a very

9    specific application in the field of amusement park rides – notably drop tower rides.  The

10   argument that the use of a conducting fin on the moving portion of a ride is equivalent to the

11   use of a stationary conducting fin contravenes the Supreme Court's warning in Warner-

12   Jenkinson – it would eliminate that element of Claim 1 in its entirety.  In short, Intamin's

13   argument under the doctrine of equivalents seeks to retrieve what it did not include in the sole

14   independent claim in the patent and what it sought, invalidly, to obtain through discredited

15   dependent Claim 10.   While the conducting fin in Magnetar's braking system arguably

16   performs substantially the same work to achieve substantially the same result as the

17   conducting rail, the means are not substantially the same.  The '350 patent requires that the

18   conducting rail extend the length of the entire track and would allow for braking at any point

19   during the course of a drop tower ride.  The conducting fin on the moving part of an

20   amusement park ride, such as a roller coaster car, provides for braking only at those locations

21   on the ride where braking magnets are placed.  Thus, the two systems, using the same physical

22   principal, operate in different ways to achieve differing objectives in the context in which they

23   are used.

24                          **b.  Prosecution History Estoppel**

25         The Court recognizes that Judge Taylor concluded that Magnetar failed to show that

26   Intamin had clearly and unmistakably surrendered the subject matter not literally encompassed

27   within Claim 1.  (See 01/24/05 Summary Judgment Order (Docket No. 60) at 5-6, 9, 12.)

28

However, having the benefit of the Federal Circuit decision, Judge Taylor's reasoning, further review of the patent file history, and the luxury of additional time to reflect with the benefit of hindsight, this Court reaches a different conclusion.   A narrowing amendment to a patent is presumptively related to patentability and gives rise to a presumption of surrender absent the presentation of evidence sufficient to rebut the presumption.  Festo Corp. v. Kabushiki Co., 344 F.3d 1359, 1366 (Fed. Cir. 2003) ("Festo X") citing Werner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 33 (1997).  Here the patent prosecution history plainly reveals a narrowing of the patent claims in response to the examiner's rejection of the original patent application.

The original patent application was filed on or about October 10, 1997.  (Jankowski Decl., Ex. 2, at 18.)  The abstract provided the following description:

> The invention concerns an amusement device (1) with one or several passenger carriers (2) and a framework (3).  It is preferably designed as dropping framework.  To brake down the movable passenger carriers is provided an eddy current brake (4).  It is preferably designed as linear brake. . . .

(Id., at 21.)  The application describes the use of eddy current brakes in other applications (id., at 22-23), and indicates that "[i]t is the purpose of the here available invention to present a better brake gear for amusement devices."  (Id., at 23.)  It further notes that "[t]he characteristic of the eddy current brake can be influenced in a wide range and can be adjusted optimal to the prevailing application as well as to the kind of amusement device."  (Id.)  The application goes on to discuss the advantages of eddy current braking, to explain the preference for a linear brake design, and to note the benefits of self-regulation within an eddy current braking system, which it further notes "is especially favourable for rides as dropping frameworks . . . .  (Id., at 24.)   The description concludes with the observation that "[i]n the subclaims are given further advantageous forms of the amusement device and of the eddy current brake."  (Id., at 25.)  The sole independent claim is set forth later in the application and reads as follows:

> Device for the public amusement with a movable device part especially a passenger carrier and a fixed device part especially a framework as well as a

1

2

brake gear by that characterized that the brake gear is designed as an eddy current brake.

(Id., at 39.)

3

The foregoing demonstrates that the focus of the original patent application was the

4

eddy current braking system, which was described as an advance over mechanical braking

5

systems for both safety and ergonomic reasons.  (See Id., at 22-25.)  However, the application

6

itself, which described eddy current braking in the most general way, noted the use of such

7

systems in other applications.  (Id., at 22-23.)  For that very reason, the examiner rejected

8

Claims 1 to 6 "as being anticipated by Baermann U.S. Patent 3,723,795."  (Id., at 58.)  The

9

examiner noted:

10

11

Baermann disclosed a device comprising a movable part (vehicles) and a fixed device part (10), an eddy current brake (1) which is designed as linear brake; the current brake (1) including at least one energizing part (26) and at least one conducting part (27).

12

13

(Id.)[2]   The examiner also noted that three additional patents awarded Baermann "all show

various types of eddy current brake."

14

15

The patent prosecution file therefore reveals that the patent sought essentially to obtain

16

a monopoly on eddy current braking systems used in amusement park rides and that the

examiner rejected the application precisely because the use of eddy current linear braking

17

systems was already disclosed in the prior art.  Taking the examiner's comments into account,

18

the applicant dramatically narrowed its patent application to eliminate a broad claim of an

19

eddy current brake, which would have encompassed Magnetar's system and any other such

20

braking system used in an amusement park ride.   In place of that broad claim, the amended

21

application contained what is now independent Claim 1, with its severely narrowed description

22

of a braking system utilizing a conducting rail configured for attachment and adapted to extend

23

the length of the fixed portion of the ride.  The revised independent Claim 1 reveals a

24

narrowing amendment plainly related to patentability and which therefore supports an

25

inference that any eddy current braking system that does not read on the narrowed claim has

26

27

[2]Moreover, it is indisputable that the principle of eddy current braking was discovered by the French physicist Foucault in the mid–19th century.

28

been surrendered. Thus, under Festo Corp. v. Kabushiki Co., 535 U.S. 722, 734-35 (2002) ("Festo VIII"), Intamin is held to the literal meaning of their claims and claim amendments. Nothing presented by Intamin supports any assertion that the presumption of surrender has been overcome in this case.[3]

The consequences of surrender are clearly spelled out in the law. Prosecution history estoppel bars a patentee from relying on the doctrine of equivalents in an infringement lawsuit when, during prosecution, it has narrowed the scope of patent claims relating to the accused equivalent. Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 220-21 (1940). The logic is straightforward: if a patentee, in response to an examiner's objection, willingly narrows a claim to secure a patent, then it is presumably sending a clear signal to the public that it is surrendering the territory beyond the literal terms of the narrowed claim. Since the patentee knew the words for the broader and narrower claim, and affirmatively chose the latter, any concerns over the inability of language to adequately describe the claimed subject matter – which motivates the doctrine of equivalence – are inapplicable. The paramount determination is whether a claim amendment has narrowed the scope of a patent claim.

Since, as noted above, the amendment had precisely that effect, Intamin cannot prove infringement by equivalents in this case. To conclude otherwise would be to ignore the limiting language that requires a conducting fail configured for attachment and adapted to extend the length of the fixed device part, and would revive the invalid dependent Claim 10 that seeks to claim what the amendment to Claim 1 surrendered.

---

[3]The law permits a patentee the opportunity to show: (1) that an alleged equivalent was either unforeseeable at the time of filing, or (2) was only tangentially related to the narrowed claim limitation, or (3) there was some other reason the equivalent could not be described in the patent. See id. at 1369-70. Intamin has not shown that any of these three exceptions to estoppel apply, nor could it. The record plainly indicates that the applicant sought a monopoly over all eddy current braking systems used in amusement park rides, and the examiner rejected that effort. The alleged equivalent here was plainly foreseeable when the application was filed and was directly related to the narrowed claim limitation.

**D. UNCLEAN HANDS**

As a third ground for summary judgment, Magnetar asserts the affirmative defense of unclean hands.  It has presented the Court with proof that Intamin did not own any rights in the '350 patent until March 2004, a few weeks before filing suit against Magnetar.  Magnetar's evidence shows that despite not having been assigned any rights in the patent, Intamin began writing letters in 2001 to several companies claiming those companies had infringed Intamin's patent and threatening litigation if the companies did not compensate Intamin by purchasing a license.  (See, e.g., Pribonic Decl., Ex. 19.)  Intamin wrote multiple such letters to Magnetar, misrepresenting its ownership of the '350 patent.  (See id., Exs. 11–16.)  Intamin's misrepresentations were effective; by early 2003, several companies had taken licenses under the '350 patent, which obligated them to pay royalties to Intamin.  (See id., Exs. 3–4.)

As explained below, Magnetar's evidence also shows that Intamin filed with the PTO fraudulent, back-dated assignments *twice*, once in 2005 and again in 2007, each of which purported to assign Intamin the rights to the '350 patent in 1997.  Intamin does not dispute Magnetar's evidence, arguing instead that the Court should not consider it.  For example, Intamin argues that such facts are irrelevant to this suit because Magnetar was not harmed by Intamin's conduct since Intamin did have proper legal title when it filed suit against Magnetar.  Intamin also argues the unclean hands doctrine is an affirmative defense improperly brought at the summary judgment stage, and furthermore, that such an affirmative defense cannot extinguish a property right.  Intamin offers the declaration of its president, with no supporting documentation at all, as evidence that Intamin had an exclusive license to the patent from the moment the inventors applied for the patent and thus had the right to sue infringers.  (See Kernacs Decl. ¶¶ 5–9.)  Finally, in a last-ditch effort, Intamin argues Magnetar has engaged in the same alleged misconduct because, in an unrelated case, Magnetar allegedly sued or threatened to sue to enforce a patent to which it did not have exclusive rights.

None of Intamin's arguments are supported by law or evidence.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## 1. THE FACTS

The Court's review of the assignments recorded with the PTO reveals two things. First, Intamin did not acquire property rights in the '350 patent until March 18, 2004, when four of the original five inventors assigned the rights to Intamin.  (See Robbins Decl., Ex. 25 [Patent Assignment Abstract of Title].)  Second, Intamin falsified an earlier patent assignment which purported to assign Intamin the rights to the '350 patent first as of March 19, 1997 and then, as a correction, as of May 19, 1997.  (See id., Exs. 25–26 at 7, 9.)  Intamin recorded this obviously falsified patent assignment *twice* in the PTO, once on September 16, 2005 and again, apparently as a correction, on March 12, 2007.  The falsified assignment appears on its face to have been executed by four of the five named inventors on the '350 patent in May and June 1997, because the signature block includes those dates handwritten next to the inventors' signatures.  Yet, the text of the assignment states it was entered into as of May 16, 2000 and it refers to the Patent Number, which was not known until the patent was issued on May 16, 2000.  The text also refers to the October 10, 1997 filing date, which was not known in May and June 1997.  Furthermore, in 1997, all five inventors held the rights to the intellectual property, not just the four.

The fact that the assignment was forged is also apparent when viewed in context of the other assignments for the '350 patent.  The progression of the assignments is inconsistent. While assignments 1 and 2 (the forged assignments) show four inventors assigning their interest to Intamin, assignment 3 shows the original five inventors assigning their interest to the company Funex AG in fall 1997.  About two years later, in June 1999, Funex AG assigned the application back to four of the five inventors.  In March 2004, those four inventors assigned the '350 patent to Intamin.  Every assignment that follows the first two forged assignments would be invalid and meaningless if Intamin held title to the rights in 1997.  The forged assignment would at least make logical sense if it were recognized as executed in May 2000, as it states in the first line of its text.  Because the signature blocks include 1997 dates, however, the Patent Assignment Abstract of Title lists them as 1997 assignments.  In fact,

handwritten notes of Intamin's president, Sandor Kernacs, shows he indicated to the PTO in the 2007 correction that the execution dates were the 1997 dates listed next to the signatures of the inventors.  (See id., Ex. 26 at 8.)

Intamin does not deny that the assignments were forged, but explains that the assignments were meant to document the understanding between Intamin and the inventors that Intamin would have all right, title and interest in the '350 patent from the filing of the application.  Intamin offers no evidence of such an understanding other than the declaration of Kernacs.

Meanwhile, from the time the '350 patent was issued, Intamin began threatening its competitors with the intellectual property rights it did not own.  Intamin sent letters to competitors notifying them of the patent and asserting its rights in the patent.  (See Pribonic Decl., Exs. 18-24.)  These letters attempted to induce competitors to pay it licensing fees or else Intamin would take legal action to enforce its rights.  At least two companies did take licenses under the '350 patent, not knowing Intamin did not actually possess any ownership interest in the patent at that time.  (See Jankowksi Decl., Exs. 3–4.)

Magnetar argues that Intamin's false claims of ownership of the patent, the falsification of documents, the suppression of evidence (by not producing these falsified assignment documents during discovery), unfounded threats of infringement, and the waging of vexatious litigation all support the Court's finding Intamin has unclean hands and denying Intamin all claims for relief.[4]

**2. THE DOCTRINE**

The defense of unclean hands arises from "the equitable maxim that 'he who comes into equity must come with clean hands.'"  Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945) (citation omitted).  "Under this doctrine, plaintiffs

---

[4]Magnetar further argues that Intamin brought this suit to harass Magnetar and offers evidence of harassment.  This argument is not within the scope of the issues presently before the Court on the pending motion for summary judgment.

seeking equitable relief must have acted fairly and without fraud or deceit as to the controversy in issue." Adler v. Fed. Republic of Nigeria, 219 F.3d 869, 877 (9th Cir. 2000) (internal quotation marks and citations omitted).  In other words, unclean hands "means that in equity as in law the plaintiff's fault, like the defendant's, is relevant to the question of what if any remedy the plaintiff is entitled to." Scheiber v. Dolby Labs., Inc., 293 F.3d 1014, 1021 (7th Cir. 2002).  Thus, the unclean hands doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." Precision Instrument Mfg. Co., 324 U.S. at 814.

The Supreme Court has made fraud on the PTO in the procurement of a patent an "unclean hands" equitable defense to an infringement action.  See id.; W.R. Grace & Co., Inc. v. W. U.S. Indus., Inc., 608 F.2d 1214, 1217 (9th Cir. 1979) (applying Precision Instrument Mfg. Co.)  The Supreme Court stressed that "where a suit in equity concerns the public interest as well as the private interests of the litigants this [unclean hands] doctrine assumes even wider and more significant proportions." Precision Instrument Mfg. Co., 324 U.S. at 815. The Court concluded:

> [t]he possession and assertion of patent rights are issues of great moment to the public.  A patent by its very nature is affected with a public interest. . . .  The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope.

Id. at 815-16 (citations omitted).

To prove unclean hands, appellate courts have required two things.  First, a defendant must prove the plaintiff engaged in inequitable conduct and, second, that the plaintiff's conduct directly relates to the claim which it has asserted against the defendant.  See, e.g., Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245 (1933) ("[Courts of equity] apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter

in litigation."); Consol. Aluminum Corp. v. Foseco Int'l Ltd., 910 F.2d 804, 810 (Fed. Cir. 1990) (applying Precision Instrument Mfg. Co. and Keystone Driller Co. and holding unclean hands requires inequitable conduct by the plaintiff and that the plaintiff's conduct had an immediate and necessary relation to the entire cause of action); Levi Strauss & Co. v. Shilon, 121 F.3d 1309, 1313 (9th Cir. 1997) ("In its claim for equitable relief, 'the defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims.'" (quoting Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 847 (9th Cir. 1987))); Republic Molding Corp. v. B.W. Photo Utils., 319 F.2d 347, 349 (9th Cir. 1963) ("[M]isconduct in the abstract, unrelated to the claim to which it is asserted as a defense, does not constitute unclean hands.")

Intamin contends that to establish unclean hands, Magnetar must additionally demonstrate that it was somehow injured or prejudiced by Intamin's conduct. For this proposition Intamin relies heavily on district court decisions, notably Grokster, a Central District case in which the court included a third requirement that the plaintiff's conduct must have injured the defendant. Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 518 F. Supp. 2d 1197, 1223 (C.D. Cal. 2007); see also Survivor Prods. LLC v. Fox Broad. Co., No. CV 01-3234 LGB (SHx), 2001 WL 35829270, at *3 (C.D. Cal. Jun. 12, 2001)) citing JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc., 128 F. Supp. 2d 926, 949 (E.D. Va. 2001), aff'd in part and rev'd in part on other grounds, 28 Fed. Appx. 207 (4th Cir. 2002)); McCormick v. Cohn, No. CV 90-0323 H, 1992 WL 687291 (S.D. Cal. Jul. 31, 1992); Broderbund Software, Inc. v. Unison World, Inc., 648 F. Supp. 1127, 1138 (N.D. Cal. 1986)). First, the Court notes that district court decisions are not binding precedent and need not be followed, particularly where circuit authority holds otherwise. Second, Survivor Productions and Broderbund are out-of-circuit district court cases that rely respectively on decisions from the Fourth and Fifth Circuits. Third, Grokster misconstrued McCormick, citing it for the proposition that "the unclean hands 'defense will not apply if the defendant merely establishes harm to the public

interest.'" Id. (citing McCormick, 1992 WL 687291, at *4).  When read in full context, however, McCormick stated:

> Whether to apply the defense of unclean hands is within the court's sound discretion.  TWA v. American Coupon Exchange, 913 F.2d 676, 695 (9th Cir. 1990).  The defense will apply to bar recovery only if the plaintiff's wrongful acts directly relate to the merits of the controversy and do not merely affect the equitable relations between the parties.  Fuddruckers, Inc. v. Doct's [sic] B.R. Others, Inc., 826 F.2d 837, 847 (9th Cir. 1987).  Many courts require the defendant to prove the plaintiff's conduct personally injured the defendant and hold the defense will not apply if the defendant merely establishes harm to the public interest.  See e.g., Broderbund Software, Inc. v. Unison World, 648 F. Supp. 1127, 1138 (N.D. Cal.1986).  The court, however, may consider the harm to the public interest.  Republic Molding, 319 F.2d at 349-50.

McCormick, 1992 WL 687291, at *4.  Its holding is therefore consistent with circuit and Supreme Court case law.

While the Court acknowledges that the district court case law that Intamin cites – much of which is unpublished – supports Intamin's contention, it is inconsistent with controlling Supreme Court, Federal Circuit and Ninth Circuit authority.  The relevant jurisprudence requires only that a defendant who asserts unclean hands prove inequitable conduct by the plaintiff and that the plaintiff's conduct directly relates to the claim which it has asserted against the defendant.  See, e.g., Keystone Driller Co., 290 U.S. at 245 (holding the unclean hands doctrine is only applied where the wrongful acts "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.") By permitting a defendant to focus on the inequitable conduct of a plaintiff seeking to enforce a patent, the Supreme Court tacitly acknowledges what it has stated expressly in other contexts – that the enforcement of a patent is a matter "concerning far more than the interests of the adverse parties." Precision Instrument Mfg. Co., 324 U.S. at 815.  The inequitable conduct of a plaintiff in a patent case is highly relevant because the patentee has been granted a legal monopoly on its invention.  Thus, "a patent by its very nature is affected with a public interest." Id. at 815-16.

This principle is reflected in Ninth Circuit jurisprudence, notably in <u>Republic Molding Corp.</u>, which was both a patent and a copyright infringement case.  That case directs trial courts to "weigh the substance of the right asserted by plaintiff against the transgression which, it is contended, serves to foreclose that right.  The relative extent of each party's wrong upon the other and upon the public should be taken into account, and an equitable balance struck."  319 F.2d at 350.  The Ninth Circuit recognized, "the extent of actual harm caused by the conduct in question, either to the defendant ***or to the public interest***, is a highly relevant consideration."  <u>Id.</u> at 349-50 (emphasis added).  The Federal Circuit similarly recognizes the relevance of inequitable conduct of a patentee, both in procuring the patent and in seeking to enforce that patent against an alleged infringer.  <u>Aptix Corp. v. Quickturn Design Sys.</u>, 269 F.3d 1369 (Fed. Cir. 2001); <u>Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.</u>, 851 F.2d 1387, 1394 (Fed. Cir. 1988).  For these reasons, the higher court decisions confer broad discretion on trial courts to apply the doctrine of unclean hands where a patentee has falsified documents or otherwise tampered with evidence.  <u>See, e.g.</u>, <u>Keystone Driller Co.</u>, 290 U.S. at 245 (patentee had unclean hands based on suppression of evidence and witness tampering); <u>Aptix Corp.</u>, 269 F.3d at 1372-73 (patentee had unclean hands in procuring the patent based on falsified notebooks); <u>Princess Cruises, Inc. v. United States</u>, 397 F.3d 1358, 1369 (Fed Cir. 2005) (citing <u>Precision Instrument Mfg. Co.</u>, 324 U.S. at 815).  Accordingly, the Court concludes that controlling appellate authority teaches that the unclean hands doctrine is available to a defendant in circumstances such as those now before this Court.

**3. ANALYSIS**

As a threshold argument, Intamin erroneously contends Magnetar cannot bring a new affirmative defense at the summary judgment stage.  To the contrary, the Ninth Circuit allows a litigant to bring an affirmative defense at the summary judgment stage, "whether or not it was specifically pleaded as an affirmative defense, at least where no prejudice results to the plaintiff."  <u>Healy Tibbitts Const. Co. v. Ins. Co. of N. Am.</u>, 679 F.2d 803, 804 (9th Cir. 1982) (finding no prejudice when the plaintiff first raised an affirmative defense of insurance policy

1   exclusion in a motion for summary judgment because both parties were aware of the

2   exclusion).  Intamin is not prejudiced by Magnetar bringing to the Court's attention Intamin's

3   own misconduct, of which its president was clearly aware.[5]  See id.  Furthermore, the Court

4   itself expressly permitted Magnetar to raise the issue of unclean hands in its February 4, 2009

5   Order.  (02/04/09 Order (Docket No. 131) at 2.)

6       Intamin next contends that its purported misconduct has occurred outside the current

7   lawsuit and therefore provides no basis for the assertion of the defense.  (See Opp. at 20.)  As

8   already explained, the Court recognizes there is a distinction between unclean hands during

9   litigation and unclean hands during the procurement of a patent.  Aptix Corp., 269 F.3d at

10   1375-76.  Here, the fraud before the PTO was not in the initial procurement of the patent,

11   which would make the patent itself fraudulent; the fraud is in the patent's chain of title.  Even

12   so, the fraud in this case, which had as a critical element the false assignments recorded before

13   the PTO, in some ways resembles fraud on the patent office as much as a fraud on Magnetar

14   and others..  Nevertheless, Intamin's misrepresentation of its ownership interest in the patent

15   was a critical element of Intamin's misconduct in its dealings with potential defendants,

16   including Magnetar, during its pre-litigation assertion of patent rights as a strong arm tactic to

17   force them into entering into a licensing agreement.[6]   But Intamin's misconduct toward

18   Magnetar did not end with the filing of the complaint.  For example, because Intamin failed to

19   produce the forged assignments or disclose their existence during the course of discovery in

20   this case, Magnetar was unable to depose the inventors to determine the validity of the

21   assignments and the accurate period of time during which Intamin has owned the rights to the

22   '350 patent.

23

24   _____

25   [5]Likewise, the Court rejects Intamin's argument that it has been prejudiced by the inability to take
     discovery related to this issue and to ask Magnetar how it believes the alleged conduct prejudiced

26   it.

27   [6]Magnetar further argues that since Intamin filed this lawsuit, potential buyers of magnetic brakes
     are hesitant to do business with any provider who has not take a patent license from Intamin.

28

Intamin stresses that in order for the doctrine of unclean hands to apply, Intamin's misconduct must relate directly to the transaction concerning which the complaint was made, i.e., Magnetar's alleged infringement.  For the reasons already described, the Court finds it does.  Intamin defends by presenting the Court with a narrative that Intamin was an exclusive licensee of the '350 patent rights and possessed the right and responsibility to enforce the patent when Intamin first contacted Magnetar about Magnetar's infringement.  As noted, the only evidence Intamin offers is the unsupported declaration of Sandor Kernacs, its president.  See Kernacs Decl. ¶¶ 3–5.  The Court finds Kernacs' testimony unpersuasive, considering it was Kernac who executed the fraudulent assignments.  Regardless, even if Intamin could prove that it was the exclusive licensee of the '350 patent right and did possess the right and responsibility to enforce the patent, Intamin has nevertheless committed misconduct related to the litigation of its infringement claim against Magnetar by forging the chain of title and failing to disclose the fraudulent assignments in discovery.

The Southern District of California addressed a similar situation involving a fraudulent ownership claim, albeit in the context of copyright infringement, in McCormick.  1992 WL 687291 at *3-4.  In McCormick, the plaintiff made materially false statements regarding ownership of the copyright before and during litigation and violated the court's discovery order by refusing to produce documents that would have had an impact on the defense.  Id.  The court dismissed with prejudice the copyright claims, finding the defense of the doctrine of unclean hands applied.  Id. at *5.  Here, Intamin made materially false statements in connection with its ownership of the '350 patent rights, both before and during litigation.  Intamin never produced the forged assignments during discovery; Magnetar discovered them through a title search.  Because Intamin's fraud before the PTO is in the chain of title and not in the patent prosecution process, it may not be severe enough to warrant stripping Intamin of

all property rights to the '350 patent; it is, however, serious enough to prevent Intamin from enforcing its rights against Magnetar in this litigation.[7]

Accordingly, as an alternative holding, the Court finds Intamin's unclean hands prevent it from recovering against Magnetar in this case.


# IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** summary judgment in favor of Defendant Magnetar on the basis of non-infringement as a matter of law and under the doctrine of unclean hands.


**IT IS SO ORDERED**.


Dated: May 22, 2009

_____
Judge Gary Allen Feess
United States District Court

---

[7] Apparently of the belief that the best defense is a good offense, Intamin also alleges it is *Magnetar* that is guilty of unclean hands.  Intamin contends Magnetar filed an unrelated suit to enforce patent rights that Magnetar did not in fact possess.  These allegations of unrelated misconduct by Magnetar are not relevant to the issues before the Court.  See Precision Instrument Mfg. Co., 324 U.S. at 814 (the unclean hands doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, *however improper may have been the behavior of the defendant*." (emphasis added)).